**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ANISSA JONES,<br>*Mother of the minor child D.M.*,<br><br>Plaintiff,<br><br>v.<br><br>DISTRICT OF COLUMBIA,<br><br>Defendant. | Civil Action No. 17-01437 (RCL/RMM) |

**REPORT AND RECOMMENDATION**

This case arises from administrative proceedings that Plaintiff Anissa Jones ("Plaintiff" or "Ms. Jones") brought against the District of Columbia ("District"), under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, *et seq*., to challenge the District of Columbia Public Schools' ("DCPS") provision of a free and appropriate public education for Plaintiff's minor child D.M. ("D.M." or "the Student"). *See generally* Compl., ECF No. 1; *see also* Pl.'s Mem. P. & A. in Supp. of Pl.'s Mot. for Summ. J. ("Pl.'s Mem.") at 2–5, ECF No. 11-2. Ms. Jones challenges the findings made in an April 29, 2017 Hearing Officer Determination ("April 2017 HOD") and alleged procedural errors from the associated April 13, 2017 Due Process Hearing. *See* Compl. ¶¶ 36–49. As relief, Ms. Jones seeks judgment on all counts and a finding that the Hearing Officer erred, and an order requiring DCPS to provide residential placement for the Student, develop an IEP consistent with residential placement, and develop a compensatory education services plan. *Id.* ¶ 50. This matter was referred to the undersigned for full case management. *See* Order, ECF No. 5; 8/8/2017 Case Referral (random referral to the

undersigned). Having considered the parties' submissions and the Administrative Record,[1] and for the reasons set forth below, the undersigned recommends that the Court GRANT-IN-PART and DENY-IN-PART Plaintiff's Motion for Summary Judgment, and GRANT-IN-PART and DENY-IN-PART Defendant's Cross-Motion for Summary Judgment.

## BACKGROUND

### I. Statutory Framework

The IDEA was enacted "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A). To that end, local school districts must ensure that "[a]ll children with disabilities residing in the State . . . regardless of the severity of their disabilities, and who are in need of special education and related services, are identified, located, and evaluated." *Id.* § 1412(a)(3)(A). A free appropriate public education ("FAPE") is defined as "special education and related services that — (A) have been provided at public expense, under public supervision and direction, and without charge; (B) meet the standards of the State educational agency; (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and (D) are provided in conformity with [a child's] individualized education program." *Id.* § 1401(9).

---

[1] Admin. Record ("AR"), ECF No. 9; Pl.'s Mot. for Summ. J. ("Pl.'s Mot."), ECF No. 11; Def.'s Cross Mot. for Summ. J. ("Def.'s Opp'n"), ECF No. 12; Def.'s Opp'n to Pls.' Mot. for Summ. J., ECF No. 13; Pl.'s Reply to Def.'s Opp'n to Pl.'s Mot. ("Pl.'s Reply"), ECF No. 14; Pl.'s Opp'n to Def.'s Cross Mot. for Summ. J., ECF No. 15; Def.'s Reply in Supp. of its Cross Mot. for Summ. J. ("Def.'s Reply"), ECF No. 16. This Report and Recommendation will cite to "Def.'s Opp'n," ECF No. 12, when referring to the Defendant's combined Motion and Opposition; and will cite to "Pl.'s Reply," ECF No. 14, when referring to the Plaintiff's combined Reply and Opposition.

If an initial evaluation determines that a child is entitled to a FAPE, the IDEA "requires the school district to create and implement an [individualized education program]." *Lesesne ex rel. B.F. v. District of Columbia*, 447 F.3d 828, 830 (D.C. Cir. 2006). This individualized educational program ("IEP") is "the means by which special education and related services are 'tailored to the unique needs' of a particular child." *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 999 (2017) (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 181 (1982)); *see also Honig v. Doe*, 484 U.S. 305, 311 (1988) (noting that Congress envisioned "the IEP as the centerpiece of the statute's education delivery system for disabled children"); *Lesesne*, 447 F.3d at 830; 20 U.S.C. § 1414(d)(2)(A). The IEP is "[p]repared at meetings between a representative of the local school district, the child's teacher, the parents or guardians, and, whenever appropriate, the disabled child." *Honig*, 484 U.S. at 311 (citing 20 U.S.C. § 1401(19)). The final product "sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." *Id.*

The IEP must be "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew*, 137 S. Ct. at 999. The IEP also must comply with the IDEA's requirement that students "be educated in the least restrictive environment possible." *Leggett v. District of Columbia*, 793 F.3d 59, 74 (D.C. Cir. 2015). After the IEP is developed, the school district must provide the child with an appropriate educational placement that comports with the IEP. *See* 34 C.F.R. § 300.116(b)(2); *Hinson ex rel. N.H. v. Merritt Educ. Ctr.*, 579 F. Supp. 2d 89, 103 (D.D.C. 2008).

Parents who disagree with the IEP or believe that a school district has violated other IDEA requirements may file a due process complaint. *See* 20 U.S.C. § 1415(b)(6). If the parties are unable to resolve the complaint within thirty days, the parents are entitled to a due process hearing before the local education agency ("LEA"). *Endrew*, 137 S. Ct. at 994; *see also* 20 U.S.C. § 1415(f)(1), (g). Either party may appeal an adverse ruling to a federal district court. *See* 20 U.S.C. § 1415(i)(2).

## II. Factual Background

D.M. is a student who is eligible for special education services based on an IDEA disability classification of Emotional Disturbance. *See* AR 6, 365. The events relevant to this case occurred between June 22, 2015 and the filing of the Complaint in this action.

### A. June 2015 HOD and July 2015 IEP

Hearing Officer Charles Carron issued a Hearing Officer Determination ("HOD") on June 22, 2015 ("June 2015 HOD"), which arose out of a prior due process complaint filed by Ms. Jones on April 24, 2015. AR 6, 130–206 (June 22, 2015 HOD). In relevant part, the June 2015 HOD ordered that "[n]o later than July 6, 2015 Respondent shall convene a meeting of the Student's IEP Team to amend the Student's IEP to provide as follows: (a) All of the Student's academic instruction shall be specialized instruction provided in the outside of general education setting." AR 201.

On July 22, 2015, the IEP Team met to review and revise D.M.'s IEP. *See* AR 229–31 (July 22, 2015 IEP Team Meeting Notes). The revised IEP provided for, *inter alia*, twenty hours of specialized instruction, consisting of five hours per week each of Specialized Instruction, Mathematics, Reading, and Written Expression, in addition to 240 minutes per month of Behavioral Support Services and 120 minutes per month of Speech-Language Pathology.

AR 224. At the IEP meeting, Ms. Jones and her attorney disagreed with the IEP and questioned the gap in hours between a full thirty-two hour school day and the 21.5 hours provided for in the IEP. AR 231.

**B. Kramer Middle School**

By letter dated July 29, 2015, DCPS advised Ms. Jones that Kramer Middle School had been identified as the new location of services that could meet D.M.'s IEP needs. AR 232. At the time, D.M. was thirteen years old and in the sixth grade. AR 260. While enrolled at Kramer Middle School, D.M. was referred for observation for a more restrictive environment referral. AR 10, 260–65. The reason for referral indicates that D.M. was involved in three "incidents that started with threats to school staff and then ended with attempted assaults on the school officers. Two of these incidents resulted in the student's arrest and then admittance to the hospital." AR 260. Based on an observation from October 22, 2015, the DCPS observer recommended that D.M. "could benefit from a more restrictive school setting where his academic and behavioral needs can be addressed." AR 264, 10.

**C. The Foundation School**

By letter dated November 18, 2015, DCPS advised Ms. Jones that the Foundation School-Largo had been identified as a new location of services. AR 267. D.M. attended the Foundation School from November 2015 to May 2016. AR 269–74. During this time, out of one hundred school days, D.M. was present for sixty-seven days and absent for thirty-three days, of which twelve were unexcused absences. *Id.* In May 2016, the Foundation School advised Ms. Jones that D.M. would be transferred out of the school due to safety concerns because he had allegedly brought a gun to school. AR 366, 10.

### D. May 2016 Team Meeting and IEP

On May 16, 2016, D.M.'s IEP team convened for an annual review of his IEP. AR 338, 360. Ms. Jones's counsel attended in person and Ms. Jones attended by telephone. *See* AR 359. At this meeting, Ms. Jones requested that D.M. be placed in a residential school. AR 361, 365–66. The IEP team meeting notes indicate that the team considered three schools: "The Phillips School, High Road Middle DC, and Ridge." AR 366. A Prior Written Notice, dated May 16, 2016, advised that the "IEP team agreed to continued services in the current level of restriction" — a non-public day school program. AR 368.

After the IEP team meeting and on the same day, Ms. Jones's counsel sent a letter to Mr. Jason Banks, the DCPS representative, requesting a meeting "to discuss changing [the Student's] LRE from a non-public day school program to a residential school program." AR 356–57. Ms. Jones proposed three meeting dates in May 2016. *Id.* On May 23, 2016, Mr. Banks responded and advised that it would not be possible to meet prior to D.M.'s withdrawal from the Foundation School. AR 369. On May 24, 2016, after a response from Ms. Jones's counsel, Mr. Banks advised that "[a] meeting to discuss a more restrictive environment can still be held." *Id.* In the interim, by letter dated May 19, 2016, DCPS advised Ms. Jones that High Road Primary and Middle School of Washington, DC had been identified as D.M.'s new location of services. AR 371.

### E. The High Road Schools

In the summer of 2016, D.M. attended High Road Primary and Middle School of Washington, DC, until it closed. AR 11, 893:4–9. By letter dated September 15, 2016, DCPS identified High Road School of Prince George's County ("High Road PG County") as D.M.'s new location of services. AR 379. However, prior to enrolling, D.M. was placed at Mountain

Manor Treatment Center in Baltimore, Maryland pursuant to a court order based on drug use. AR 12, 385–402. D.M. was at Mountain Manor from September 28, 2016 to October 28, 2016. AR 387. While there, D.M. had incidents of aggression and disruptive behavior. AR 12, 400, 402.

In November 2016, D.M. began attending High Road PG County, where he was enrolled through the duration of the underlying administrative action in this matter. AR 12. High Road PG County is a non-public special education school that primarily services students with educational disabilities. AR 911:3–14. From November 2016 to April 2017, D.M. was enrolled for a total of eighty-six days of school, and was absent on fifty-eight of those days. AR 268. In January 2017, D.M. was referred for truancy to the D.C. Superior Court, as he had missed more than fifteen days of school in a row. *See* AR 409–51. In late January 2017, Ms. Jones's counsel reached out to Mr. Christopher Aiello, Program Director for High Road PG County, requesting a meeting in order to discuss moving the Student to a residential school. AR 496–97.

On February 6, 2017, the IEP team met to discuss Ms. Jones's request for a more restrictive environment for D.M. AR 543–45. At this meeting, Mr. Aiello opined that although D.M. had an aggressive incident at the school, he had not exhibited "any major disruptive behaviors." AR 544. The team also discussed the fact that Ms. Jones had "tried everything" to get D.M. to go to school, but had been unsuccessful. *Id.* DCPS determined that D.M. did not require a more restrictive environment. AR 545. However, Ms. Renee Cartwright, the DCPS representative, advised that she would confer with her supervisor and colleagues who may be more familiar with the case, and follow up with Ms. Jones and her counsel if the decision had changed. *Id.*

On February 15, 2017, D.M. exhibited physical aggression towards the staff of High Road PG County and caused damage to school property during the incident. AR 547–48. The school suspended D.M. for three days. AR 546.

## III. Procedural Background

On February 17, 2017, Ms. Jones filed the Due Process Complaint ("DPC") underlying the HOD in this matter. AR 588–96. On February 21, 2017, DCPS filed its response to Ms. Jones's DPC. AR 604–06. DCPS then amended its response on February 22, 2017. AR 609–11. On March 14, 2017, Hearing Officer Peter Vaden ("Hearing Officer") held a prehearing teleconference. AR 647. In a Prehearing Order dated March 14, 2017, the Hearing Officer identified the following four issues to be resolved:

> A. Whether DCPS denied Student a FAPE, and violated a June 2015 Hearing Officer Determination by failing to offer Student an appropriate full-time IEP and suitable educational placement by the beginning of the 2015-2016 school year when Student was Kramer MS;
>
> B. Whether since May 2016 through the present, DCPS has denied Student a FAPE by failing to ensure that an IEP team was convened to review his academic, social, emotional and behavioral needs and to provide for Student's placement in a therapeutic residential school;
>
> C. Whether since July 2015, DCPS has denied Student a FAPE by failing to ensure that Student's IEP teams discussed his least restrictive environment and described the team's LRE consideration and decision on Student's IEPs;
>
> D. Whether since May 2016, DCPS has denied Student a FAPE by failing to ensure that a Prior Written Notice was issued to the parent notifying her of the IEP team's decision not to change Student's placement to a more restrictive setting, the reasons therefor and options considered.

AR 647. The Hearing Officer further stated that, as relief, Ms. Jones sought an order directing D.M.'s placement at a suitable therapeutic residential school, the appropriate review and revision of D.M.'s IEP to reflect his alleged need for residential placement, and compensatory education. *Id.* The Order also noted that "DCPS does not address Petitioner's allegations concerning

denials of FAPE in the 2015–2016 school year at Kramer MS, the failure of the IEP team to describe discussions of Student's LRE on his IEP, or DCPS' failure to issue Prior Written Notices." AR 648. Accordingly, the Hearing Officer ordered DCPS to:

> file a revised response to the due process complaint, within 5 business days, that addresses each of the [aforementioned] issues and includes —
>
> (i) An explanation of why the agency proposed or refused to take the action raised in the due process complaint;
>
> (ii) A description of other options that the IEP Team considered and the reasons why those options were rejected;
>
> (iii) A description of each evaluation procedure, assessment, record, or report the agency used as the basis for the proposed or refused action; and
>
> (iv) A description of the other factors that are relevant to the agency's proposed or refused action.

*Id.* By response dated March 16, 2017, DCPS submitted a second amended response to Ms. Jones's DPC. AR 656–59.

The Due Process Hearing was held on April 13, 2017, and both parties were represented by counsel. AR 3, 778. Ms. Jones presented two witnesses: Ms. Ava Hughes Booker and Ms. Jones, herself. AR 779. Ms. Booker was presented as an expert witness in special education, specifically regarding the Emotional Disturbance disability, residential placements, and IEP development and review, including LREs. AR 826–28. DCPS presented three witnesses: Mr. Christopher Aiello, Program Director of High Road School PG County; Ms. Renee Cartwright, DCPS Monitoring Specialist in the non-public program; and Ms. Jacqueline Waters, Assistant Principal of Kramer Middle School. AR 909, 940–41, 990–91.

At the beginning of the hearing, Ms. Jones raised a procedural issue and moved for a directed verdict for DCPS's alleged failure to comply with the Hearing Officer's Prehearing Order. AR 784–88. Specifically, Ms. Jones contended that DCPS's second amended response failed to address the issues for which the Hearing Officer had ordered an amended response, and

thus she merited a directed verdict "because I have no idea what their position is." AR 785:8–21. The Hearing Officer denied Ms. Jones's request, explaining that if Ms. Jones thought the answer to be "insufficient," she should have filed something earlier to protest. AR 786:18–787:8. The Hearing Officer noted that he had not received any such filing, and noted that any motion for directed finding should have been filed before the hearing and in writing. AR 787.

Ms. Jones then requested, in the alternative, a sanction precluding DCPS "from putting on any evidence concerning these issues." AR 788:18–789:1. The Hearing Officer again denied Ms. Jones's request "basically for the same reason." AR 790. He explained that he did not believe the motion to be raised timely and that any motion for sanctions should have been raised in writing prior to the hearing. *Id.* No further procedural issues were raised. *Id.*

By HOD dated April 29, 2017, the Hearing Officer found that DCPS had not denied D.M. a FAPE as alleged in Ms. Jones's DPC. *See generally* AR 3–30. Specifically, the Hearing Officer found that "the July 22, 2015 IEP provision for only 20 hours of Specialized Instruction, outside general education, did not result in a denial of FAPE to Student." AR 16. Combining the remaining three issues under one heading,[2] the Hearing Officer found: (1) that the May 2016 IEP sufficiently described the Student's LRE, AR 18; (2) that the May 2016 Prior Written Notice ("PWN") though deficient, did not "impede the parent's opportunity to participate in the process or result in harm to the Student," AR 20; and (3) that as of the May 16, 2016 IEP meeting, "the IEP team's decision to maintain Student's placement at a nonpublic special day school for students with emotional disabilities was reasonably calculated to enable Student to make

[2] *See supra* at 8 (outlining Issues B, C, and D identified in the Hearing Officer's Prehearing Order).

progress appropriate in light of his circumstances," AR 22. The Hearing Officer therefore found that D.M. was not denied a FAPE.

Next, the Hearing Officer considered D.M.'s present need for residential placement. AR 22–28. On this issue and request for relief, the Hearing Officer determined that he did not have enough information on the record "to determine that a residential institution is Student's least restrictive educational environment." AR 27–28. Accordingly, the Hearing Officer ordered DCPS to obtain an independent or other qualified psychologist "to conduct a supplemental psychological assessment of Student to specifically assess Student's need for a residential placement considering, *inter alia*, Student's disability, his educational needs, his current emotional and behavioral functioning, and Student's noncompliance with school attendance requirements and its relationship to his disability." AR 29. The Hearing Officer further ordered that such assessment would include a recommendation regarding appropriate treatment. *Id.* The Order called for the reconvening of the IEP team upon receipt of the psychological assessment report, in order to review and revise, if appropriate, D.M.'s educational placement. *Id.* Finally, the Hearing Officer denied Ms. Jones's request for a prospective residential placement and all other relief requested. *Id.*

On July 19, 2017, Ms. Jones filed this action challenging the Hearing Officer's determination. *See generally* Compl. This matter was subsequently referred to the undersigned for full case management. *See* Order, ECF No. 5; 8/8/2017 Case Referral. After the District submitted the administrative record to the Court, the parties cross-moved for summary judgment. *See generally* AR; Pl.'s Mot.; Def.'s Opp'n.

## LEGAL STANDARD

### I. Summary Judgment

Federal Rule of Civil Procedure 56 governs summary judgment motions, which must be granted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). When determining whether summary judgment is appropriate, a court must view the evidence and inferences in the light most favorable to the party opposing summary judgment. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). However, if the moving party satisfies its initial burden of showing that no genuine dispute exists as to any material fact, the opposing party must still demonstrate more than "[t]he mere existence of a scintilla of evidence" in support of its position in order to make summary judgment improper. *Anderson*, 477 U.S. at 252.

In the IDEA context, "[a] motion for summary judgment operates as a motion for judgment based on the evidence comprising the record and any additional evidence the Court may receive." *N.W. v. District of Columbia*, 253 F. Supp. 3d 5, 12 (D.D.C. 2017) (quoting *D.R. ex rel. Robinson v. Gov't of D.C.*, 637 F. Supp. 2d 11, 16 (D.D.C. 2009)) (internal quotation marks omitted); *Brown v. District of Columbia*, 179 F. Supp. 3d 15, 23 (D.D.C. 2016); *see* 20 U.S.C. § 1415(i)(2)(C) (noting that the court "shall hear additional evidence at the request of a party). When no additional evidence is introduced, "the motion for summary judgment is simply the procedural vehicle for asking the judge to decide the case on the basis of the administrative record." *Q.C-C. v. District of Columbia*, 164 F. Supp. 3d 35, 44 (D.D.C. 2016) (quoting *Heather S. v. State of Wis.*, 125 F.3d 1045, 1052 (7th Cir. 1997)) (modifications omitted). Thus in the absence of additional evidence, a motion for summary judgment under the IDEA "is not a true

summary judgment procedure. Instead, the district court essentially conduct[s] a bench trial based on a stipulated record." *L.R.L. ex rel. Lomax v. District of Columbia*, 896 F. Supp. 2d 69, 73 (D.D.C. 2012) (quoting *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1472 (9th Cir. 1993)).

## II. Review of IDEA Administrative Decisions

Where, as here, a party seeks to challenge an administrative decision, a "party aggrieved by the findings and decision" has the right to bring a civil action. 20 U.S.C. § 1415(i)(2)(A). The party challenging the determination carries "the burden of persuading the court that the hearing officer was wrong." *Kerkam v. McKenzie* (*Kerkam I*), 862 F.2d 884, 887 (D.C. Cir. 1988); *see also Brown*, 179 F. Supp. 3d at 23. When evaluating these challenges, a court receives "the records of the administrative proceedings" and must "hear additional evidence at the request of a party" before "grant[ing] such relief as the court determines is appropriate" based "on the preponderance of the evidence." 20 U.S.C § 1415(i)(2)(C). Thus the IDEA standard of review is "more rigorous" and less deferential than that applied to review administrative decisions under the Administrative Procedure Act. *Reid ex rel. Reid v. District of Columbia*, 401 F.3d 516, 521 (D.C. Cir. 2005); *Kerkam*, 862 F.2d at 887.

However, "this standard does not authorize unfettered de novo review." *Brown*, 179 F. Supp. 3d at 23. Courts review questions of law *de novo. Reid*, 401 F.3d at 521. Otherwise, courts must give "due weight" to the administrative proceedings and should not "substitute their own notions of sound educational policy for those of the school authorities which they review." *Rowley*, 458 U.S. at 206; *see Kerkam ex rel. Kerkam v. Superintendent, D.C. Pub. Schs.* (*Kerkam II*), 931 F.2d 84, 87–88 (D.C. Cir. 1991) (deferring to the findings of the hearing officer where "the administrative record contains sufficiently reasoned, specific findings" to support the

conclusion); *see also N.W.*, 253 F. Supp. 3d at 12. Courts accord less weight to determinations that do not involve the exercise of educational expertise "because a federal court is just as well suited to evaluate the situation." *Serpas v. District of Columbia*, No. 02-CV-2227 (HHK), 2005 WL 3211604, at *5 (D.D.C. Oct. 28, 2005) (quoting *Kings Local Sch. Dist. Bd. of Educ. v. Zelazny*, 325 F.3d 724, 728 (6th Cir. 2003)) (citing *McKenzie v. Smith*, 771 F.2d 1527, 1535 n.17 (D.C. Cir. 1985)) (internal quotation marks omitted). Finally, "[f]actual findings from the administrative proceedings are to be considered *prima facie* correct." *Brown*, 179 F. Supp. 3d at 23 (quoting *Roark ex rel. Roark v. District of Columbia*, 460 F. Supp. 2d 32, 38 (D.D.C. 2006)) (internal quotation marks omitted). Those factual findings warrant deference "unless [the Court] can point to contrary nontestimonial extrinsic evidence [in] the record." *Savoy v. District of Columbia*, 844 F. Supp. 2d 23, 30 (D.D.C. 2012).

## DISCUSSION

When reviewing an administrative decision under Section 1415(i)(2) of the IDEA, courts must consider two questions: "First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?" *Rowley*, 458 U.S. at 206–07 (internal footnotes omitted); *see also N.S. ex rel. Stein v. District of Columbia*, 709 F. Supp. 2d 57, 67 (D.D.C. 2010). Here, the parties' dispute involves a challenge to the Hearing Officer's substantive rulings and alleged procedural errors. Specifically, the parties have cross-moved for summary judgment on the following six issues:

1. Whether the Hearing Officer erred in finding that Defendant's failure to comply with the June 22, 2015 HOD did not deny the Student a FAPE.

2. Whether the Hearing Officer erred in finding that the Student's May 2016 IEP was sufficient and did not deny the Student a FAPE.

3. Whether the Hearing Officer erred by finding that the May 2016 Prior Written Notice, issued by the Defendant, was deficient, but that such deficiency did not deny the Student a FAPE.

4. Whether the Hearing Officer erred in determining that more information was necessary to address the question of whether the Student required a residential school placement, ordering such further evaluation, and closing the record.

5. Whether the Hearing Officer erred in failing and refusing to order and award compensatory education services.

6. Whether the Hearing Officer erred in failing and refusing to order sanctions against the Defendant for failure to comply with the Prehearing Order as it relates to the filing of an Amended Answer.

Each issue is addressed in turn below.

## I. Whether the Hearing Officer Erred in Finding that DCPS's Failure to Comply with the June 22, 2015 HOD Did Not Deny D.M. a FAPE

### A. *Res Judicata* Does Not Bar Plaintiff's Claims

The District asserts that Ms. Jones's previous appeal of the June 22, 2015 HOD, brought in *Jones v. District of Columbia* ("*Jones I*"), No. 15-cv-01505 (BAH/GMH), limits the claims that she can bring in this action. Def.'s Opp'n at 10. The District invokes *res judicata* but fails to specify which of Plaintiff's arguments are barred by that doctrine. *See id.* For example, the District notes that Plaintiff cannot "challeng[e] whether the June 22, 2015 HOD's order regarding placement failed to provide D.M. a FAPE," *id.*, but acknowledges that Plaintiff raises no such claim in this litigation. *See id.* at 11 ("Plaintiff does not contest that the placement ordered by the June 22, 2015 HOD provided FAPE."). Construing Defendant's motion generously, the District appears to contend that *res judicata* precludes Ms. Jones from arguing that the July 2015 IEP deviated from the placement mandated by the June 2015 HOD because the June 2015 placement decision was or could have been litigated in *Jones I*.[3]

[3] The District asserts that its *res judicata* argument should be deemed conceded because Ms. Jones failed to respond to it. *See* Def.'s Reply at 2–3. Ms. Jones can hardly be faulted for

"Res judicata involves two separate legal theories—claim preclusion and issue preclusion." *Theodore v. District of Columbia*, 772 F. Supp. 2d 287, 292 (D.D.C. 2011). The District appears to invoke claim preclusion, which "prohibits 'successive litigation of the very same claim' by the same parties." *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2305 (2016) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 748 (2001)). Under the doctrine of claim preclusion, "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Friendship Edison Pub. Charter Sch. Chamberlain Campus v. Suggs*, 562 F. Supp. 2d 141, 148 (D.D.C. 2008) (quoting *Allen v. McCurry*, 449 U.S. 90, 94 (1980)) (internal quotation marks omitted). A party raising a claim preclusion defense must establish three elements: "(1) the presence of the same parties or privies in the two suits; (2) claims arising from the same cause of action in both suits; and (3) a final judgment on the merits in the previous suit." *Theodore*, 772 F. Supp. 2d at 293 (quoting *Friendship Edison*, 562 F. Supp. 2d at 148) (internal quotation marks omitted). To determine whether matters involve the same cause of action, courts look to whether "they share the same 'nucleus of facts.'" *Apotex, Inc. v. FDA*, 393 F.3d 210, 217 (D.C. Cir. 2004) (quoting *Drake v. FAA*, 291 F.3d 59, 66 (D.C. Cir. 2002)).

1. Issues Litigated in *Jones I*

In *Jones I*, Ms. Jones sued the District of Columbia and challenged several rulings from a June 22, 2015 HOD including: whether compensatory education should be awarded; whether a March 2014 IEP and a January 2015 re-evaluation of D.M. were deficient; whether the hearing officer erroneously limited the number of diagnostic assessments that would be conducted;

---

overlooking this issue, given that the District's argument consists of little more than a few conclusory assertions and highlights a claim that Ms. Jones has not pursued in this litigation. Accordingly, the undersigned declines to treat the *res judicata* defense as conceded.

whether D.M. was entitled to a new FBA; whether the Hearing Officer procedurally erred by making alternative findings; whether an IEP team should have been reconvened; whether the Hearing Officer should have awarded prospective placement at a private school; and whether D.M. should have been provided a dedicated aide and speech therapy. *See* R. & R.,[4] *Jones I*, ECF No. 30 (Jan. 31, 2017); *see also* AR 130, 504–42 (copy of R. & R. from *Jones I*). The complaint also alleged that DCPS had refused to comply with the educational placement ordered in the June 2015 HOD, but Ms. Jones withdrew this claim in her motion for summary judgment. *See* Compl. ¶ 62, *Jones I*, ECF No. 1 (D.D.C. Sept. 16, 2015); Pl.'s Mem. of P. & A. in Supp. of Mot. Summ. J. at 22, *Jones I*, ECF No. 22-1 (D.D.C. May 3, 2016). The court concluded that Ms. Jones had waived her compensatory education claims, ruled in favor of Ms. Jones on her challenges to the January 2015 re-evaluation, the limits on the number of diagnostic assessments, and the failure to order a new Functional Behavioral Assessment, and rejected Ms. Jones's other claims. *See* Order, *Jones I*, ECF No. 31 (D.D.C. Feb. 22, 2017).

In *Jones I*, Ms. Jones also unsuccessfully moved for a "stay put" preliminary injunction, pursuant to 20 U.S.C. § 1415(j) and 34 C.F.R. § 300.518. *See* Pl.'s Mot. for a Prelim. Inj., *Jones I*, ECF No. 8 (Nov. 11, 2015) ("*Jones I* PI Mot."). The IDEA's "stay put" provision is "an automatic injunction" that prevents school districts from modifying a child's educational placement while litigation is pending. *District of Columbia v. Vinyard*, 901 F. Supp. 2d 77, 83–84 (D.D.C. 2012) (quoting *Laster v. District of Columbia*, 439 F. Supp. 2d 93, 98–99 (D.D.C. 2006)). In her preliminary injunction motion, Ms. Jones requested that DCPS be required to

[4] The administrative record includes the *Jones I* Report and Recommendation and the Order adopting that Report and Recommendation. AR 501–42. The Court takes judicial notice of the remaining docket entries in that matter. *See Rogers v. District of Columbia*, 880 F. Supp. 2d 163, 166 (D.D.C. 2012) (noting that "this Court may take judicial notice of public records" including court docket sheets).

provide D.M. the educational placement that the Hearing Officer had deemed appropriate in the June 2015 HOD. *See Jones I* PI Mot., Pl.s' P. & A. in Supp. of Mot. for Prelim. Inj. at 8–12, ECF No. 8-1. The Court denied the preliminary injunction motion as moot. *See* Minute Order, *Jones I* (D.D.C. Feb. 5, 2016).

2. <u>Whether *Jones I* Precludes Plaintiff's Current Challenge</u>

Comparing *Jones I* to the instant case, two of the three *res judicata* elements are clearly met. *Jones I* and this matter involve the same parties — Ms. Jones on behalf of the Student was the Plaintiff and the District was the Defendant. The partial grant of the parties' cross-motions for summary judgment constituted a "final judgment on the merits." *See Alford v. Providence Hosp.*, 60 F. Supp. 3d 118, 126 n.7 (D.D.C. 2014) (emphasis omitted) ("[I]t is well established that summary judgment — whatever its basis — constitutes a final judgment *on the merits* for the purposes of claim preclusion.") (citing *Prakash v. Am. Univ.*, 727 F.2d 1174, 1182 (D.C. Cir. 1984)) (citing additional cases). Thus, the dispositive question is whether these two suits share a common nucleus of fact. As part of this inquiry, "the court will consider 'whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage.'" *Apotex,* 393 F.3d at 217 (quoting *I.A.M. Nat'l Pension Fund v. Indus. Gear Mfg. Co.*, 723 F.2d 944, 949 n.5 (D.C. Cir. 1983)) (internal quotation marks omitted).

The claims litigated in *Jones I* arise from a different HOD and set of facts than Ms. Jones' current challenge to the implementation of the educational placement ordered in the June 2015 HOD. In the administrative proceedings that preceded *Jones I*, Ms. Jones obtained a favorable ruling in which the Hearing Officer determined that D.M. should receive only specialized instruction outside of the general education setting and directed DCPS to modify

D.M.'s IEP accordingly. *See* R. & R. at 11–12, *Jones I*; *see also* AR 512–13 (identifying the issues raised at the June 2015 hearing). Ms. Jones did not, and could not have, challenged that ruling in *Jones I*, because she prevailed on it at the administrative stage. *See* 20 U.S.C. § 1415(i)(2)(A) (authorizing a federal civil action where a party has been "aggrieved by the findings and decision" of a hearing officer). Here, Ms. Jones contests determinations from the April 2017 HOD, including the Hearing Officer's determination that DCPS's failure to fully comply with the June 2015 HOD's educational placement ruling was a procedural violation that did not deny D.M. a FAPE. *See* Pl.'s Mem. at 5–8; Compl. ¶ 37. The difference in timing demonstrates that the claims involve a different nucleus of facts; *Jones I* arose from decisions DCPS made regarding D.M.'s education before April 2015, whereas the instant case arises from decisions DCPS made after June 2015.

As noted above, Ms. Jones initially challenged the implementation of the June 2015 HOD in *Jones I*, arguing that the educational placement diverged from what was ordered in the HOD, but withdrew that claim. *See* Pl.'s Mem. of P. & A. in Supp. of Mot. Summ. J. at 22, *Jones I*. But even if it had not been withdrawn, Ms. Jones could not have successfully pursued that claim in *Jones I* because no cause of action exists to enforce a favorable decision by the hearing officer as part of a challenge to the hearing officer's unfavorable rulings. *See B.D. v. District of Columbia*, 817 F.3d 792, 802 (D.C. Cir. 2016) (holding that Section 1415(i)(2)(A) of the IDEA does not create a separate cause of action to enforce favorable hearing officer decisions). The fact that the implementation of the June 2015 HOD occurred after the HOD was issued also would have barred Ms. Jones' implementation claim in *Jones I*, because "[t]he law is clear that the scope of an IDEA hearing extends only to those issues raised in the Due Process Complaint, and that matters not presented to the Hearing Officer are not administratively exhausted for the

purposes of district-court review."[5] *Adams ex rel. T.J. v. District of Columbia*, 285 F. Supp. 3d 381, 394 (D.D.C. 2018).

At bottom, given that claim preclusion "does not bar a litigant from doing in the present what he had no opportunity to do in the past," the doctrine does not prevent Ms. Jones from challenging the Hearing Officer's resolution of her claim that DCPS's imperfect implementation of the educational placement ordered in the June 2015 HOD denied D.M. a FAPE. *Drake*, 291 F.3d at 67. "Preclusion is designed to limit a plaintiff to one bite at the apple, not to prevent even that single bite. It thus precludes later theories or pleas for relief arising out of the same claim only if they could have been asserted in the earlier case." *Hurd v. District of Columbia*, 864 F.3d 671, 679 (D.C. Cir. 2017) (concluding that a prior section 1983 damages claim was not the same as a habeas claim for *res judicata* purposes because plaintiff could not seek damages in *habeas*). This case presents Ms. Jones's first opportunity to raise a claim alleging that the July 2015 IEP failed to implement the June 2015 HOD and denied D.M. a FAPE, and *Jones I* does not preclude her from litigating that issue here.

To the extent the District contends that the *Jones I* preliminary injunction motion presented the same issue as the instant case, and thus has preclusive effect, that argument also fails. "Under the issue preclusion aspect of res judicata, a final judgment on the merits in a prior suit precludes subsequent relitigation of issues actually litigated and determined in the prior suit, regardless of whether the subsequent suit is based on the same cause of action." *Nextwave*

[5] The D.C. Circuit has not determined whether the IDEA's exhaustion requirements are jurisdictional, and courts have reached conflicting conclusions on that issue. *Compare T.H. v. District of Columbia*, 255 F. Supp. 3d 55 (D.D.C. 2017) (finding that "the IDEA's administrative-exhaustion requirement is not jurisdictional") with *Douglas v. District of Columbia*, 65 F. Supp. 3d 225, 229 (D.D.C. 2014) (concluding that failure to exhaust IDEA claim deprives court of subject matter jurisdiction).

*Personal Commc'ns, Inc. v. FCC*, 254 F.3d 130, 147 (D.C. Cir. 2001) (quoting *I.A.M. Nat'l Pension Fund*, 723 F.2d at 947) (internal quotation marks omitted). The District notes that "whether D.M.'s July 22, 2015 IEP complied with the June 22, 2015 HOD" was "previously litigated . . . in a preliminary injunction [motion] in *Jones I*." Def.'s Opp'n at 10–11 n.2; *see also* AR 14–15 n.2 (describing subject matter of preliminary injunction motion and noting that neither party argued that *Jones I* had "preemptive or preclusive effect."). However, that motion did not directly challenge the July 2015 IEP, and instead simply sought a "stay put" order preventing DCPS from deviating from the July 2015 IEP while litigation was pending. *See generally Jones I* PI Mot. Reviewing a motion for a "stay put" order requires the court to determine "what constitutes [a student's] current educational placement," and whether a LEA has changed that placement. *Leonard ex rel. Leonard v. McKenzie*, 869 F.2d 1558, 1563–64 (D.C. Cir. 1989) (internal quotation marks omitted); *Z.B. ex rel. Sanchez v. District of Columbia*, 292 F. Supp. 3d 300, 303 (D.D.C. 2018) ("A party seeking a stay-put injunction 'must identify, at a minimum, a fundamental change in, or elimination of a basic element of the education program in order for the change to qualify as a change in educational placement.'" (quoting *Lunceford v. D.C. Bd. of Educ.*, 745 F.2d 1577, 1582 (D.C. Cir. 1984))); *Vinyard*, 901 F. Supp. 2d at 84–85. That analysis does not require the court to determine whether the current educational placement complies with the IDEA or whether deviating from that educational placement constitutes a denial of FAPE. Therefore, in resolving the *Jones I* preliminary injunction motion, the court would not have ruled on the merits of the issue disputed here. That ruling consequently has no issue preclusive effect.

### B. Appropriateness of the July 2015 IEP

Turning to the merits of the dispute, Ms. Jones challenges two alleged deficiencies in the July 2015 IEP. Ms. Jones contends that the IEP's provision for only twenty hours of specialized instruction failed to comply with the June 2015 HOD, and therefore denied D.M. a FAPE. Pl.'s Mem. at 5–6. Second, and relatedly, Ms. Jones briefly argues that the July 2015 IEP failed to discuss or reflect D.M.'s LRE. *Id.* at 7. The District asserts that the July 2015 IEP complied with the June 2015 HOD and therefore did not deny D.M. a FAPE. *See* Def.'s Opp'n at 9–12.

#### 1. The Nature of the Deviation from the June 2015 HOD

##### *a. Hours of Instruction Outside General Education*

The June 2015 HOD required that "[a]ll of the Student's academic instruction shall be specialized instruction provided in the outside of general education setting." AR 201. The IEP provides for a total of twenty hours per week of special education outside of general education, consisting of five hours per week in "Specialized Instruction," "Mathematics," "Reading," and "Written Expression." AR 223. There are more than twenty hours of instructional time in a week of school. *See* AR 231 (noting in IEP meeting discussion that the 21.5 hours reflected on the IEP do not account for all weekly school hours); *see also* Pl.'s Mem. at 6 (noting that there are approximately 32.5 hours in a full week of school). However, even accounting for the "Related Services" included on the IEP, the Student's IEP does not cover a full school day. AR 223. Consequently, the Hearing Officer determined that "DCPS' failure to provide in [the July 2015] IEP for *all* academic instruction to be provided outside the general education setting contravened the requirements of the June 22, 2015 HOD." AR 15 (emphasis added).

The District contends that the July 2015 IEP fully implemented the June 2015 HOD's requirement for instruction outside of general education. Specifically, the District argues that the

June 2015 HOD's reference to "academic instruction" does not encompass *all* forms of instruction, and that music, art, PE and Spanish are examples of non-academic instruction that could be provided in a general education setting.[6] Def.'s Opp'n at 9–12; Def.'s Reply at 2–3. The District appears to believe that instruction in these other areas would account for the remaining hours in a week of school.

The record contradicts the District's position. In the June 2015 HOD, Hearing Officer Carron made a factual finding "that as of January 22, 2015, the Student required all of his instruction to be provided in the outside of general education setting, in a small classroom . . . , with a low ratio of students to adults . . . , with at least two adults in the classroom." AR 169 ¶ 179 (footnotes omitted); *see also* AR 173 ¶ 202; AR 195 ¶ 26 (noting conclusion of law). Hearing Officer Carron also determined that "the Student could not, as of January 22, 2015, be educated with non-disabled peers." AR 169 n.17. In the meeting notes to the July 22, 2015 IEP meeting, Ms. Deborah Lyons, the LEA/School Representative, noted that the IEP would provide special education services in "academic subjects as math, reading, and written expression," and that the team also had "included specialized instruction hours to cover the other hours (PE, Art, and music)." AR 231. Taken together, the Hearing Officer's rulings and the IEP meeting notes indicate that all of D.M.'s instruction, including in the areas that the District characterizes as non-academic, should have been provided outside of the general education setting.

As it is undisputed that a school week encompasses more than twenty hours, the July 2015 IEP clearly deviated from the June 2015 HOD by failing to provide more than twenty hours

---

[6] The District's position on this point is contrary to the Hearing Officer's finding that the July 2015 IEP failed to comply with the requirements of the June 2015 HOD. However, the District did not separately appeal this aspect of the HOD. Nevertheless, the Court ascertains the extent of the July 2015 IEP's deviation from the June 2015 HOD to provide context for its evaluation of whether that deviation deprived D.M. of a FAPE.

of specialized instruction outside of general education. Accordingly, the Hearing Officer's conclusion, that this aspect of the July 2015 IEP failed to comply with the June 2015 HOD warrants deference, is supported by a preponderance of record evidence, and therefore, should not be disturbed.

*b. Least Restrictive Environment*

Ms. Jones also contends that the July 2015 IEP failed to discuss and describe D.M.'s LRE for the hours not accounted for in the specialized education plan and therefore denied D.M. a FAPE. Pl.'s Mem. at 7. Ms. Jones's argument is brief, and in response the District notes only that "[t]he previous HOD . . . determined [the Student's] LRE and placement . . ." and quotes the Order set forth in the June 2015 HOD. Def.'s Opp'n at 11. The HOD contained a header identifying DCPS's alleged "fail[ure] to ensure that Student's IEP teams discussed his [LRE] and described the team's LRE consideration and decision on Student's IEPs" as a disputed issue, but failed to address the July 2015 IEP when reviewing that issue. AR 5; *see* AR 16–22 (discussing only the May 16, 2016 IEP). In the absence of any findings or analysis from the Hearing Officer, no decision exists for the undersigned to give weight to, and the undersigned must independently evaluate Ms. Jones's claim. *See generally Kerkam II*, 931 F.2d at 87 ("[A] decision without 'reasoned and specific findings' deserves 'little deference.'").

The IDEA requires that students be placed in "the least restrictive environment possible — that is, the one that provides 'some educational benefit' and 'most closely approximates' the education a disabled child would receive if she had no disability." *Leggett*, 793 F.3d at 73 (quoting *Kerkam II*, 931 F. 2d at 86); *see also* 20 U.S.C. § 1412(a)(5)(A) ("To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled . . . ."). To that end, an

IEP should "enable[] the child to achieve passing marks and advance from grade to grade in the least restrictive environment possible." *Dixon v. District of Columbia*, 83 F. Supp. 3d 223, 232 (D.D.C. 2015) (citing *K.S. v. District of Columbia*, 962 F. Supp. 2d 216, 220 (D.D.C. 2013)) (internal quotation marks omitted). The IDEA and regulations do not expressly address whether and to what extent an IEP must address the LRE. However, in *Brown v. District of Columbia,* the Court concluded that "an IEP team is required to discuss a student's specific LRE and the IEP is required to include at least a brief description of it." 179 F. Supp. 3d at 26–27 (discussing cases indicating that IEPs frequently include a description of the LRE); *see also* 20 U.S.C. § 1414(d)(1)(A)(i)(V) (requiring that an IEP include "an explanation of the extent, if any, to which the child will not participate with nondisabled children in the regular class and in the activities described in subclause (IV)(cc)"); 34 C.F.R. § 300.320(a)(5); D.C. Mun. Regs. tit. 5-E, § 3009.1(e). The reasoning in *Brown* is persuasive, "given the emphasis the IDEA places on the concept of an LRE and the central role the IEP plays in the broader statutory framework." *Brown*, 179 F. Supp. 3d at 27.

The July 2015 IEP for D.M. neither expressly addressed the LRE for the remaining hours of instruction that were not specifically accounted for in the IEP, nor described how and in what environment those hours would be spent. *See* AR 224. In response to an inquiry from Ms. Jones's counsel regarding the number of hours assigned to special education in the IEP and the remaining number of hours in a school day, the IEP team stated that D.M.'s "remaining hours will not be in a general ed setting." AR 231. That implies that a special education classroom wholly removed from general education may have been the LRE for D.M. However, the IEP failed to clearly resolve the issue, thereby contravening the June 2015 HOD.

2. Whether the July 2015 IEP Denied D.M. a FAPE

The Court must next determine whether the above identified deficiencies in the July 2015 IEP denied D.M. a FAPE. Ms. Jones contends that the IEP's failure to account for more than twenty hours of specialized education directly affected D.M.'s education because it caused some instruction to be provided by general education teachers and that both omissions impeded Ms. Jones' ability to meaningfully participate in decisions regarding D.M.'s education. *See* Pl.'s Mem. at 7. The District counters that D.M. received a FAPE because all of his academic instruction occurred in a special education setting and because he had limited exposure to nondisabled peers. *See* Def.'s Reply at 3.

"[P]rocedural flaws do not automatically render an IEP legally defective." *N.S.*, 709 F. Supp. 2d at 67 (quoting *Roland M. v. Concord Sch. Comm.*, 910 F.2d 983, 994 (1st Cir. 1990)) (internal quotation marks omitted); *see also Brown*, 179 F. Supp. 3d at 25. "[A]n IDEA claim is viable only if those procedural violations affected the student's *substantive* rights." *Lesesne*, 447 F.3d at 834 (citing cases); *accord Leggett*, 793 F.3d at 67. Procedural violations rise to that level only "if the procedural inadequacies — (I) impeded the child's right to a free appropriate public education; (II) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education to the parents' child; or (III) caused a deprivation of educational benefits." 20 U.S.C. § 1415(f)(3)(E)(ii).

The Hearing Officer concluded that the IEP's failure to expressly require that all hours of education occur outside general education did not deprive D.M. of a FAPE because D.M. was "actually offered all of his academic instruction in the outside of general education setting." AR 15–16. The Hearing Officer also noted that, in the relatively brief period of time when D.M.

attended Kramer Middle School, D.M. was placed in a "self-contained Behavior and Education Support (BES) classroom," where he received "all of his academic instruction." AR 15. The Hearing Officer did not address whether the failure to address the LRE deprived D.M. of a FAPE.

The IEP's failure to expressly require that D.M. receive all instruction in a general education setting negatively impacted Ms. Jones's ability to participate in the decision making process regarding the environment in which D.M. would be educated. The IDEA gives parents a significant role in the development of a student's IEP. Indeed, "[t]he core of the statute, . . . is the cooperative process that it establishes between parents and schools." *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 53 (2005) (citing *Rowley*, 458 U.S. at 205–06). Ms. Jones and her counsel asked questions about the hours that were not accounted for in the IEP and were advised that the instruction would be outside of general education. *See* AR 231. The Hearing Officer determined that the school provided full time special education to D.M., despite the fact that the IEP did not expressly require it to do so.[7] AR 15. However, the omission of a provision in the IEP explicitly mandating that D.M. receive full time special education gave school officials discretion to determine how and in what setting those additional hours would be spent. At the IEP meeting, Ms. Jones and her counsel were advised that "[t]he remaining hours will vary based on his next school and how they provide services." AR 231. Failing to resolve this important issue in the IEP significantly impeded Ms. Jones's ability to participate in, provide input, and be informed about the educational setting for the hours that were not addressed in the IEP.

[7] Ms. Jones appears to believe that some of those hours were spent in general education, but the Court has no basis to disturb the Hearing Officer's finding given the absence of non-testimonial evidence contradicting that finding. *See Savoy*, 844 F. Supp. 2d at 30.

The IEP's failure to address the LRE also significantly impeded Ms. Jones's participation in the development of the IEP. This case is similar to *Brown*, where the Court determined that the lack of a description of the LRE rendered the IEP "legally deficient." *Brown*, 179 F. Supp. 3d at 27. *Brown* recognized that the failure to address the LRE in the IEP "effectively deprived plaintiff of the opportunity 'to understand what services will be provided and make a determination about whether the proposed placement is adequate.'" *Id.* (quoting *N.S.*, 709 F. Supp. 2d at 70). Here too, the omission prevented Ms. Jones and her attorney from evaluating and responding to the recommended LRE, or thoroughly discussing the issue with the IEP team.

In sum, both deficiencies constitute substantive violations of the IDEA that "undermine[d] [the] student and parent's right to engage in the collaborative process engineered to create an IEP tailored to address the specific needs of each disabled student." *Id.* (internal quotation marks omitted); *cf. N.S.*, 709 F. Supp. 2d at 70 (noting that "failures to include required information in an IEP about the services to be provided a disabled student" are more significant than other errors such as "failures to meet statutory deadlines"). Accordingly, the undersigned recommends that the trial judge find that the District's failure, in the July 2015 IEP, to describe the LRE or to account for all hours of education provided during the school week, constituted a denial of a FAPE. *Cf. Brown*, 179 F. Supp. 3d at 27.

## II. Whether the Hearing Officer Erred in Finding that D.M.'s May 2016 IEP was Sufficient and Did Not Deny D.M. a FAPE

Ms. Jones also challenges the May 2016 IEP, asserting that the Hearing Officer erred in concluding that: (1) the May 2016 IEP provided a sufficient description of D.M.'s LRE; and (2) DCPS did not deny D.M. a FAPE by failing to place D.M. in a residential school under the 2016 IEP or thereafter. Pl.'s Mem. at 8–9; *see also* AR 18, 20–22. Although Ms. Jones's residential placement claim encompasses a time period after the May 2016 IEP had been superseded, the

undersigned will follow the lead of the Hearing Officer and evaluate the portion of that argument that pertains to the placement decision in the May 2016 IEP as part of the analysis of Ms. Jones's challenge to the IEP's adequacy. *See generally* AR 16–17 (considering as part of its analysis of the appropriateness of the May 2016 IEP whether "DCPS denied Student a FAPE because it did not offer Student a residential placement in the May 16, 2016 IEP or at any time since").

**A. Whether the May 2016 IEP's LRE Satisfied IDEA Procedural Requirements**

As discussed *supra*, "an IEP team is required to discuss a student's specific LRE and the IEP is required to include at least a brief description of it." *Brown*, 179 F. Supp. 3d at 27. Ms. Jones contends that the May 2016 IEP failed to meet this requirement because it did not identify the "type of setting" for the LRE that D.M. requires, such as "a mainstream public school, a separate public school, a non-public school, a residential school, or perhaps a hospital." Pl.'s Mem. at 9–10. The District counters that the LRE was discussed in the IEP team meetings and clearly defined in the IEP, and that Ms. Jones had an opportunity to participate in the discussions regarding that issue. Def.'s Opp'n at 15.

The Hearing Officer rejected Ms. Jones's arguments and concluded that the IEP adequately described D.M.'s LRE. AR 18. The Hearing Officer noted that the IEP team meeting notes reflect the team's discussion of the fact that D.M. would not be educated with non-disabled peers. *Id.* The Hearing Officer also determined that the final IEP provided for the number of hours of specialized instruction, the size of the Student's instruction group, the maximum number of students, and indicated that instruction would occur outside of the general education setting. *Id.*

Record evidence supports the Hearing Officer's findings. *See* AR 360–367. The meeting notes and subsequent emails in the Administrative Record clearly indicate that those present at

the IEP team meeting discussed D.M.'s LRE.[8] *See* AR 366, 369–70, 372. For example, the copy of the notes submitted by Ms. Jones indicates that Ms. Jones was informed by the Foundation School that D.M. would be "transferred out of the current location of service due to safety concerns," indicated that three other locations were considered, and noted that Ms. Jones had requested consideration of a "more restrictive environment. AR 366; *see* Def.'s Opp'n at 15. The May 2016 IEP addressed the number of hours of instruction, described the appropriate setting, and identified the reasons for providing those services. *See* AR 348. Ms. Jones contends that the IEP is deficient because it failed to identify the "type of setting," such as the type of school. Pl.'s Mem. at 9–10. However, the IDEA and regulations require only "a brief description" of the student's specific LRE. *Brown*, 179 F. Supp. 3d at 27. Therefore, the undersigned concurs with the Hearing Officer that the IEP provided a sufficient description of the LRE, and therefore no procedural violation occurred. *Cf. Middleton v. District of Columbia*, 312 F. Supp. 3d 113, 152 (D.D.C. 2018) (finding no denial of FAPE where IEP description of LRE contained more detail than the IEP at issue in *Brown* but did not identify by name the specific program where the student would receive instruction).

Even if the IEP's failure to identify the type of school constituted a procedural violation — which it did not — it would not have constituted a denial of a FAPE. Ms. Jones argues that the omission of the LRE's "type of setting" in the IEP interfered with her right to participate in the decisionmaking regarding the education of her child. However, the record shows that Ms. Jones and her counsel participated in discussions regarding the location at which D.M. would

---

[8] There appear to be two sets of IEP team meeting notes in the Administrative Record, one submitted by the District and the other by Ms. Jones. *See* AR 360–363 (Respondent's Exhibit), 364–367 (Petitioner's Exhibit). Although both sets are nearly identical, Petitioner's Exhibit includes additional language under "Least Restrictive Environment." *Compare* AR 362 *with* AR 366.

receive special education services. At the IEP team meeting, Ms. Jones was informed that her child would be transferred to another school and the pertinent discussion included consideration of three other schools. AR 366. Emails subsequent to the meeting also indicate that Ms. Jones and her counsel were aware of the type of locations under consideration and discussed those locations at the meeting. *See* AR 372, 369. In an email dated May 19, 2016, Ms. Jester indicated, "[o]n behalf of Ms. Jones I voiced great concern that moving the student to another non-public day school program would not solve the problems he was presenting with at Foundation School." AR 372. In another email dated May 23, 2016, Ms. Jester wrote, "As I expressed at the meeting on May 16, it is not clear at all what High Road Primary and Middle School will have to offer that Foundation School did not have to offer." AR 369. In sum, Ms. Jones and her counsel had an opportunity to participate in discussions about the school that D.M. would attend, and to convey their concerns and preferences. Consequently, any alleged violation is purely technical and did not deny D.M. a FAPE. *See* 20 U.S.C. § 1415(f)(3)(E)(ii) (listing criteria that support finding that a procedural violation denied student a FAPE); *Middleton*, 312 F. Supp. 3d at 151–52 (finding no denial of FAPE due to an alleged procedural deficiency in the IEP's discussion of the student's LRE where "the record shows that [the parent] was aware of the type of instruction [the student] had been receiving" and her advocate had sent emails requesting more restrictive placement).

### B. Whether the May 2016 IEP's LRE Meets the IDEA's Substantive Requirements

Ms. Jones also contends that the May 2016 IEP was substantively deficient because it failed to require that D.M. be placed at a therapeutic residential school as Ms. Jones had requested. Pl.'s Mem. at 8. A residential institution, *i.e.*, a school at which the student resides, is "the most restrictive of settings" that can be ordered. AR 20. Instead of requiring a residential

placement, the May 2016 IEP placed D.M. at a private special education day school, and he was later moved to another special education day school. *See* AR 21.

An IEP must be "reasonably calculated to enable the child to receive educational benefits[.]" *Rowley*, 458 U.S. at 206–07; *see also Endrew*, 137 S. Ct. at 999; *Middleton*, 312 F. Supp. 3d at 128 (quoting *Rowley*, 458 U.S. at 206–07). The school "need not guarantee the best possible education or even a 'potential-maximizing' one." *Leggett*, 793 F.3d at 70 (quoting *Rowley*, 458 U.S. at 197 n.21). "[T]he adequacy of an IEP can be measured only at the time it is formulated, not in hindsight." *District of Columbia v. Walker*, 109 F. Supp. 3d 58, 66 (D.D.C. 2015). Accordingly, courts do not evaluate an IEP by looking at the student's "subsequent progress" but instead consider whether the "IEP was appropriately designed and implemented so as to convey a meaningful benefit" to the student. *S.S. ex rel. Shank v. Howard Rd. Acad.*, 585 F. Supp. 2d 56, 66 (D.D.C. 2008).

The Hearing Officer found that, given the information the IEP team had in May 2016, the team's decision to place D.M. at a nonpublic special day school, instead of a residential school, was "reasonably calculated to enable the Student to make progress appropriate in light of his circumstances." AR 22. The Hearing Officer noted that Ms. Jones's primary complaint was that "despite her best efforts and all of the interventions attempted by the court and community services agencies, as well as by DCPS" and the private day schools D.M. attended, D.M. "will not consistently attend school unless there is . . . 'enforced instruction.'" AR 16. The Hearing Officer distinguished the concern about D.M.'s attendance from any identified deficiency in the educational benefit D.M. would receive from the proposed residential placement. AR 21. The Hearing Officer recognized that Ms. Booker, Plaintiff's expert witness, had opined that D.M.'s IEP should have been revised to include a residential placement after he was expelled from the

Foundation School. AR 21. However, the Hearing Officer found Ms. Booker's testimony "unpersuasive," noting that she had "never evaluated Student or spoke to him or to any of his instructors" at the Foundation School, and that D.M. was expelled for allegedly carrying a weapon to school which had no relation to his ability to receive academic benefits at the school. *Id.*

The Hearing Officer's analysis includes sufficiently reasoned and specific findings, supported by the record, to warrant deference. *See Gregory-Rivas v. District of Columbia*, 577 F. Supp. 2d 4, 8 (D.D.C. 2008); *J.N. v. District of Columbia*, 677 F. Supp. 2d 314, 322 (D.D.C. 2010) ("[A] District Court must accept the state agency's credibility determinations unless the non-testimonial, extrinsic evidence in the record would *justify* a contrary conclusion." (quoting *Shore Reg'l High Sch. Bd. of Educ. v. P.S. ex rel. P.S.*, 381 F.3d 194, 199 (3d Cir. 2004)) (internal quotation marks omitted)). Ms. Jones has presented no record evidence that contradicts the Hearing Officer's conclusion that D.M. could have received an educational benefit from a non-residential school if he had attended class. In a non-residential setting, D.M. was to receive specialized instruction, behavioral support services, and speech-language pathology to address his needs. *See* AR 331–32. Accordingly, the Hearing Officer did not err in finding that the IEP team's decision to place D.M. at a day school "was reasonably calculated to enable [D.M.] to make progress appropriate in light of his circumstances." AR 22.

The District makes arguments regarding the appropriateness of D.M.'s placement at High Road School in Washington, D.C., and thereafter, High Road School in Prince George's County, Maryland, and those schools' capability of meeting D.M.'s needs. *See* Def.'s Opp'n at 12–16. However, this issue was not addressed below. Ms. Jones did not directly challenge, in the administrative proceedings below, the appropriateness of D.M.'s placement at the High Road

Schools; rather, she challenged whether her request for residential placement was properly considered and rejected. In resolving Ms. Jones's claim, the Hearing Officer did not consider whether the schools at which D.M. was placed were inappropriate for any reason other than their status as day schools. *See* AR 5 (identifying disputed issue as "[w]hether since May 2016 through the present, DCPS has denied Student a FAPE by failing to ensure that an IEP team was convened to review his academic, social, emotional, and behavioral needs and to provide for Student's placement in a therapeutic residential school"). Accordingly, as the "Court cannot address an issue that was not first presented to the hearing officer," the arguments raised by the District are not properly before the Court and will not be addressed in this Report and Recommendation. *Roark*, 460 F. Supp. 2d at 43 (citing cases); *Adams*, 285 F. Supp. 3d at 394 ("The law is clear that the scope of an IDEA hearing extends only to those issues raised in the Due Process Complaint, and that matters not presented to the Hearing Officer are not administratively exhausted for the purposes of district-court review.").

For the reasons discussed above, the undersigned finds no reason to disturb the Hearing Officer's findings regarding the adequacy of the LRE in the IEP and recommends that the trial judge affirm the Hearing Officer's determination that the Student's May 2016 IEP was sufficient and did not deny the Student a FAPE.

## III. Whether the Hearing Officer Erred by Finding that the May 2016 Prior Written Notice was Deficient but the Deficiency Did Not Deny D.M. a FAPE

Ms. Jones also challenges the Hearing Officer's determination that DCPS's procedural failure — to explain in the May 2016 PWN its refusal to require a residential placement for D.M. — did not deprive D.M. of a FAPE. *See* Pl.'s Mem. at 10–11; AR 18–20. Ms. Jones contends that this deficiency denied D.M. a FAPE because it impeded her ability to participate in the education decisionmaking process by depriving her of information about D.M.'s educational

placement. Pl.'s Mem. at 10–11; Pl.'s Reply at 3–4. The District counters that the PWN, while deficient, did not deny D.M. a FAPE because Ms. Jones was informed about the change in location for D.M.'s educational services and which locations the school district considered. Def.'s Opp'n at 16–17; Def.'s Reply at 4–5.

Under the IDEA, parents of a child with a disability must receive written notice before a public agency proposes to change, or refuses to change, their child's educational placement. 34 C.F.R. § 300.503(a). The PWN must include:

> (1) A description of the action proposed or refused by the agency;
>
> (2) An explanation of why the agency proposes or refuses to take the action; and
>
> (3) A description of each evaluation procedure, assessment, record, or report the agency used as a basis for the proposed or refused action.

*Id.* § 300.503(b)(1)–(3); AR 19; *see also* D.C. CODE § 38–2571.03. Accordingly, the failure to issue a proper PWN constitutes a procedural violation of the IDEA. *See Rowley*, 458 U.S. at 206–07 ("First, has the State complied with the procedures set forth in the Act?"). Here, the May 2016 PWN failed to address residential placement, noting only that D.M. would receive services "in the current level of restriction" and that "[n]o additional options [were] considered." AR 368. Neither party challenges the Hearing Officer's conclusion that the PWN's failure to address residential placement constitutes a procedural violation of the applicable regulations. *See* Def.'s Opp'n at 16–17 (arguing that any deficiencies did not deprive the Student of a FAPE).

The Hearing Officer concluded that the deficiency in the PWN did not rise to the level of a denial of a FAPE. AR 20. As discussed *supra*, a procedural violation such as the inadequacy of the PWN constitutes a denial of a FAPE only if it negatively impacts "the student's *substantive* rights," *Lesesne*, 447 F.3d at 834, *i.e.*, by impeding "the child's right to a [FAPE]," "the parents' opportunity to participate in the decisionmaking process regarding the provision of

a [FAPE]," or causing the "deprivation of educational benefits." 20 U.S.C. § 1415(f)(3)(E)(ii); *see also N.S.*, 709 F. Supp. 2d at 67; *Brown*, 179 F. Supp. 3d at 25. In finding that the deficiency did not rise to that level, the Hearing Officer noted that "[t]he purpose of the prior written notice requirement 'is to ensure that parents are aware of the decision so that they may pursue procedural remedies.'" AR 20 (quoting *M.B. ex rel. Berns v. Hamilton Se. Schs.*, 668 F.3d 851, 861–62 (7th Cir. 2011)). He then observed that Ms. Jones had counsel who "represented her at the May 16, 2016 IEP meeting, communicated on her behalf with DCPS and, seasonably, filed the present due process complaint." *Id.* The Hearing Officer reasoned that, with the assistance of counsel, Ms. Jones had been involved in the decision-making process and able to pursue any remedies. *Id.* Accordingly, the Hearing Officer concluded that Ms. Jones was not deprived of the opportunity to participate in the process and that the PWN's deficiency did not cause harm to the Student. *Id.*

The Hearing Officer's ruling warrants deference because "the basis for the officer's conclusion is clear and supported by 'sufficiently reasoned, specific findings'" and record evidence. *Gregory-Rivas*, 577 F. Supp. 2d at 8 (quoting *Kerkam II*, 931 F.2d at 88) (noting that "the hearing officer's determination should not be upset" where it is based on reasoned and specific findings). It is undisputed that Ms. Jones was represented by counsel. Ms. Jones participated by telephone in the IEP team meeting where the pending transfer and placements were discussed, and subsequent emails between Ms. Jones's counsel and DCPS make clear that Ms. Jones and her counsel were aware of the pending transfer and the possible location. *See supra* Part II; AR 366, 369, 372. Ms. Jones expressly requested a more restrictive residential placement, and DCPS's decision to nonetheless maintain the then-existing level of restriction clearly constituted a rejection of that request. AR 366.

In sum, Ms. Jones has not demonstrated that the Hearing Officer erred in concluding that the PWN's procedural inadequacy did not deprive D.M. of a FAPE. The undersigned therefore recommends that the trial judge uphold the Hearing Officer's ruling.

## IV. Whether DCPS Denied D.M. a FAPE by Failing to Ensure that DCPS Convened an IEP Team Between May 2016 and February 2017 to Review D.M.'s Needs and Consider Placing Him in a Therapeutic Residential School

As noted *supra,* Ms. Jones's challenge to DCPS's alleged failure to adequately discuss or provide a residential placement encompasses a time period from May 2016 to the present. *See* Part II. In addition to challenging the adequacy of the May 2016 IEP on that basis, Ms. Jones contends that DCPS's alleged failure to timely convene an IEP team to discuss residential placement constituted a denial of FAPE. *See* Pl.'s Mem. at 8–9. As Ms. Jones's claim references the time period of "May 2016 through the present," *id.* at 8, Plaintiff's claim also could be read to include a challenge to DCPS's failure to order residential placement in the February 2017 IEP team meeting. *See* AR 16 (defining disputed issue to include whether failure to provide for a residential placement "[s]ince May 2016 through the present" constituted a denial of FAPE).

A challenge to decisions made at the IEP team meeting is temporally distinct from Ms. Jones's claim that D.M. required residential placement as of April 2017, the time of the hearing. Plaintiff's DPC included such a claim, asserting that DCPS "failed to provide a FAPE to the Student by failing and refusing to from May 2016 to the present to review/revise the Student's IEP to provide for a more restrictive placement, i.e., a placement in a therapeutic residential school." AR 595. However, Ms. Jones presents no arguments in her summary judgment motion regarding the decision to deny a residential placement at the February 2017 team meeting, focusing instead on whether the team should have met prior to February 2017, whether the May

2016 IEP was deficient for failing to require residential placement, and whether the Hearing Officer should have ordered that D.M. be placed prospectively at a residential school. *See* Pl.'s Mem. at 8–10.[9] Therefore the undersigned will not address that issue. Instead, this section of the Court's analysis will address whether DCPS's alleged failure to timely convene an IEP team meeting to discuss residential placement constituted a denial of a FAPE; the Hearing Officer's resolution of Ms. Jones's request for prospective residential placement will be addressed in the next section.

The Hearing Officer did not address Ms. Jones's contention that DCPS's failure to convene a meeting to discuss residential placement, between May 2016 and January 2017, constituted a denial of a FAPE. The issue was preserved in the DPC and thus was properly presented to the Hearing Officer. *See* AR 594–95 ("D.C. Public Schools has failed to provide a FAPE to the Student by failing and refusing from May 2016 to January 2017 to convene an IEP meeting to discuss and determine the need for placement in a therapeutic residential school and to review/revise the Student's IEP to provide for a more restrictive placement, i.e., a placement in a therapeutic residential school . . . ."). In the absence of any Hearing Officer ruling to which the Court could defer, the Court must independently review the law and the record to evaluate Ms. Jones's claim.

Ms. Jones argues that the IEP team's February 2017 meeting occurred too late, and that the team should have been convened earlier to discuss a residential placement. Ms. Jones contends that she requested the meeting in May 2016, and that DCPS agreed to convene such a

[9] The Motion's only reference to the failure to require residential placement during this interim time period appears in an argument subheading that identifies the disputed issue as whether the Hearing Officer "erred by failing to find that since May 2016 through the present, DCPS has denied Student a FAPE by failing to . . . provide for Student's placement in a therapeutic residential school as repeatedly requested by Plaintiff." Pl.'s Mem. at 8.

meeting but failed to do so until February 2017. *See* Pl.'s Mem. at 9; Pl.'s Reply at 3. Ms. Jones does not identify a statute or regulation that required the team to meet during that time period or to schedule a meeting upon a parent's request. She simply notes the timing of the meeting, then conclusorily asserts that the circumstances denied D.M. a FAPE. *See* Pl.'s Mem. at 8–9. That argument is unpersuasive.

A delay in convening an IEP or multi-disciplinary team meeting constitutes a denial of FAPE only if it affects the student's substantive rights. *See Leggett*, 793 F.3d at 68; *D.R.*, 637 F. Supp. 2d at 18. "A delay does not affect substantive rights if the student's education would not have been different had there been no delay." *D.R.*, 637 F. Supp. 2d at 18 (citing cases); *see also Leggett*, 793 F.3d at 68 (noting that a delay affects a student's substantive rights "if the student's education *would* have been different but for the procedural violation").

Assuming *arguendo* that the timing of the February 2017 meeting violated a procedural requirement of the IDEA, it did not deny D.M. a FAPE. At the February 2017 meeting, the IEP team declined to require a residential placement. AR 543–45. Nothing in the record indicates that the team would have reached a different decision if it had met earlier. Accordingly, the timing of the meeting did not affect D.M.'s education and did not constitute a denial of a FAPE. The undersigned therefore recommends that the trial judge resolve this issue in favor of the District.

## V. Whether the Hearing Officer Erred in Denying Without Prejudice Plaintiff's Claim that D.M. Needed a Residential Placement and Ordering DCPS to Conduct Further Evaluations and Reconvene the IEP Team to Consider Residential Placement

Ms. Jones also challenges the Hearing Officer's decision to request a further evaluation of D.M., identify next steps for D.M.'s IEP team, and close the record, instead of determining on the basis of the record whether D.M. should have a residential placement prospectively. *See*

Pl.'s Mem. at 11–17. In so ruling, the Hearing Officer denied, without prejudice, Ms. Jones's request to place D.M. in a residential school. AR 28. Ms. Jones contends that this was erroneous and denied D.M. a FAPE. The District counters that there was insufficient evidence to determine whether D.M. needed a residential placement, and that the Hearing Officer therefore correctly closed the record and directed the IEP team to address the placement at a future IEP meeting after receiving the results of a new evaluation of D.M. *See* Def.'s Opp'n at 17–19.

Although the IDEA requires that students be placed in the least restrictive environment that suits their needs, it also "provides for residential placement," and recognizes that "such a placement may be necessary to meet the individual needs of a handicapped child." *McKenzie*, 771 F.2d at 1534. "To determine whether a residential placement is appropriate, a court must analyze 'whether full-time placement may be considered necessary for educational purposes, or whether the residential placement is a response to medical, social or emotional problems that are segregable from the learning process.'" *Id.* (quoting *Kruelle v. New Castle Cty. Sch. Dist.*, 642 F.2d 687, 693 (3d Cir. 1981)); *see also Walker*, 109 F. Supp. 3d at 66 n.5. A residential placement chosen solely to respond to "medical, social or emotional problems that are segregable from the learning process" is "unnecessary to the student's education." *Leggett*, 793 F.3d at 71 (quoting *McKenzie*, 771 F.2d at 1534) (internal quotation marks omitted); *see also Ashland Sch. Dist. v. Parents of Student R.J.*, 588 F.3d 1004, 1010 (9th Cir. 2009). The failure to provide residential placement in those circumstances would not deny the student a FAPE. However, if a residential placement is "primarily oriented toward enabling [the student] to obtain an education," that placement may, under the IDEA and its implementing regulations, be necessary to provide the student a FAPE. *Leggett*, 793 F.3d at 72 (quoting *Dale M. ex rel. Alice M. v. Bd.

*of Educ. of Bradley–Bourbonnais High Sch. Dist. No. 307*, 237 F.3d 813, 817 (7th Cir. 2001)) (internal quotation marks omitted).

The Hearing Officer considered Ms. Jones's claim that D.M. had a then-present need for residential placement, but concluded that the record was insufficient to allow him to determine whether the proposed residential placement would be the least restrictive environment in which D.M.'s educational needs could be met. AR 27–28. The Hearing Officer recognized that D.M. had a severe emotional disturbance disability and that he had refused to regularly attend school since the winter break. AR 22, 26. The Hearing Officer further found that "[t]he preponderance of the evidence makes it likely that [D.M.'s] defiant truancy results from his ED disability rather than from a 'purely moral failing.'" AR 26 (citing educational expert's opinion that D.M.'s "bullying, noncompliance, argumentativeness, and nonattendance were glaring manifestations of his ED disability"). However, the Hearing Officer concluded that it was unclear whether the requested residential placement was necessary "merely for confinement and to try to ensure [D.M.] attends school, or in order to get therapeutic treatment to address his disability." AR 26–27. Accordingly, the Hearing Officer could not ascertain whether residential placement would be necessary to address D.M.'s educational needs or purely responsive to "medical, social or emotional problems that are segregable from the learning process." *McKenzie*, 771 F.2d at 1534 (quoting *Kruelle*, 642 F.2d at 693) (internal quotation marks omitted).

To resolve the deficiency in the record, the Hearing Officer directed DCPS to retain an independent psychologist

> to conduct a supplemental psychological assessment of Student to specifically assess Student's need for a residential placement considering, *inter alia*, Student's disability, his educational needs, his current emotional and behavioral functioning, and Student's noncompliance with school attendance requirements and its relationship to his disability, and to recommend appropriate treatment whether Student is placed in a therapeutic day school or in a residential institution.

AR 29. DCPS was further directed to convene the IEP team to review the result of that evaluation, and to make any necessary revisions to the IEP and D.M.'s educational placement. *Id.* If the parties could not reach agreement through that process, Ms. Jones could request an expedited due process hearing to resolve the issue. *Id.*

The Hearing Officer based his conclusion on a careful evaluation of the legal standard and the record evidence. The Hearing Officer referenced testimony from Mr. Aiello indicating that the Student did well when he attended school and Ms. Jones's testimony that she sought the Student's placement in a residential school for "enforced instruction." AR 27 (internal quotation marks omitted). The Hearing Officer also observed that no testimony had been provided based on a current evaluation of the Student from any independent or expert psychologist. *Id.* The Hearing Officer recognized that Ms. Jones's educational advocate had opined that D.M. needed a therapeutic residential placement to address his emotional issues, but gave little weight to her opinion because she was not a psychologist and had neither evaluated nor spoken with D.M. *Id.* The Hearing Officer also noted that Ms. Jones had presented no evidence regarding the type of therapy needed to address D.M.'s truancy issues, or whether any residential school could offer such services. *Id.* Finally, the Hearing Officer also noted that DCPS had failed to provide evidence showing that D.M. could make academic progress in school without first overcoming his attendance issues. *Id.*

The thoroughness of the Hearing Officer's analysis entitles his ruling to due weight and deference. *See Moradnejad v. District of Columbia*, 177 F. Supp. 3d 260, 278 (D.D.C. 2016); *Turner v. District of Columbia*, 952 F. Supp. 2d 31, 37 (D.D.C. 2013). Ms. Jones must overcome that deference in order to demonstrate that the Hearing Officer's ruling should be reversed. *See Gregory-Rivas*, 577 F. Supp. 2d. at 8 ("[P]rovided that the basis for the officer's

conclusion is clear and supported by 'sufficiently reasoned, specific findings,' the hearing officer's determination should not be upset." (quoting *Kerkam II*, 931 F.2d at 87–88)). She has not met that burden.

The Hearing Officer did not err in concluding that the record lacked sufficient evidence to allow him to determine whether a residential placement would be necessary and in ordering an independent educational evaluation to fill that gap. Ms. Jones contends that the Hearing Officer overlooked the ample record evidence of D.M.'s "significant emotional, behavioral, and truancy issues" and attributes D.M.'s truancy and lack of educational progress to those issues. Pl.'s Mem. at 12–15. However, as noted above, the Hearing Officer acknowledged that D.M.'s disability likely contributed to his "defiant truancy," but emphasized that the record lacked evidence establishing that a residential placement would be the least restrictive means to provide an educational benefit in light of that behavior. AR 26–28. Neither Ms. Jones nor the District presented reliable testimony that identified the services necessary to address D.M.'s attendance and behavioral issues or the type of educational facility that could provide those services. An independent educational evaluation completed in February 2016 noted that "should [D.M.] be unable to consistently stay at school due to his behaviors, the team should consider whether or not [D.M.] requires a higher level of support," AR 258, but the record developed for the due process hearing did not include a more recent evaluation addressing that issue. The Hearing Officer reasonably concluded that these deficiencies in the record prevented him from determining whether a residential placement would be necessary and appropriate, and directed DCPS to obtain a supplemental evaluation to fill that evidentiary gap. AR 27–28. Accordingly, the undersigned finds no reason to disturb the Hearing Officer's conclusion that an additional evaluation was necessary to fully examine whether D.M. needed residential placement.

Ms. Jones also asserts that the Hearing Officer erred in ordering that any evaluation be sent back to the original IEP team that declined to place the Student in a residential school. Pl.'s Mem. at 16–17. Ms. Jones cites no applicable law that would prevent the Hearing Officer from sending this issue to the original IEP team. The IDEA requires that in developing an IEP, the IEP team consider, among other items, "[t]he results of the initial or most recent evaluation of the child." 34 C.F.R. § 300.324(a)(1)(iii); *see also* 20 U.S.C. § 1414(d)(3)(A)(iii) (requiring the IEP team to "consider . . . the results of the initial evaluation or most recent evaluation of the child."). Accordingly, as the undersigned has already found the Hearing Officer's determination to order an independent educational evaluation ("IEE") appropriate, any subsequent re-evaluation of the Student's LRE would require the IEP team to consider the results of that evaluation. Ms. Jones's speculative belief that the IEP team would be predisposed to deny residential placement did not require DCPS to create a new IEP team.[10] Indeed, delegating this assessment to a new group of individuals who lacked familiarity with D.M.'s past experience would be counterproductive.

Ms. Jones also argues that the Hearing Officer's order of additional testing "[r]esulted in a [l]engthy and [u]nnecessary [d]elay [t]hat [i]nflicted [a]dditional [s]ignificant [h]arm on the Student." Pl.'s Mem. at 15. According to Ms. Jones, the evaluation did not occur until August 2017, which delayed the IEP, and D.M. was not enrolled at a residential school until December 2017. *Id.* at 16. This appears to be a challenge to DCPS's implementation of the April 29, 2017 HOD. That matter is not properly before the Court. "[T]he scope of an IDEA hearing extends

[10] The summary judgment record suggests that Ms. Jones's fears were unfounded. The IEP team appears to have recommended residential placement based on the results of an IEE completed in August 2017. Pl.'s Mot., Ex. 3, ECF No. 11-6 (Prior Written Notice – Notice of Change in Placement); *see also* Pl.'s Mot., Ex. 2 at 1, ECF No. 11-5 (Report of Independent Educational Evaluation).

only to those issues raised in the Due Process Complaint, and . . . matters not presented to the Hearing Officer are not administratively exhausted for the purposes of district-court review." *Adams*, 285 F. Supp. 3d at 394; *see also Roark*, 460 F. Supp. 2d at 43 (citing *Shaw v. District of Columbia*, 238 F. Supp. 2d 127, 140 (D.D.C. 2002)) ("[T]his Court cannot address an issue that was not first presented to the hearing officer."). Any claim regarding a delay in the implementation of the April 2017 HOD is based on events that postdate the hearing, and thus could not have been administratively exhausted. *See* AR 5 (stating the issues considered by the Hearing Officer). If Ms. Jones wishes to argue that the DCPS's failure to properly and timely implement the HOD denied D.M. a FAPE, she must present that issue to the Hearing Officer in the first instance, as she did with her challenge to DCPS's implementation of the June 2015 HOD. Accordingly, the undersigned will not address this issue.

Finally, Ms. Jones argues that it was error for the Hearing Officer to close the record. Pl.'s Mem. at 17. However, having found that the record lacked sufficient evidence to evaluate the request for residential placement, and facing the regulatory deadlines that govern due process hearings, the Hearing Officer had little choice but to close the record pending the psychological evaluation. The HOD had to be completed within seventy-five days of the school district's receipt of the due process complaint, *i.e.*, by May 3, 2017, and it is inconceivable that a comprehensive evaluation could have been completed and reviewed by the IEP team in that short time frame. *See* 34 C.F.R. § 300.515(a) (requiring final decision on due process hearing within forty-five days after the end of the thirty-day period for the local educational agency to attempt to resolve the issues raised in a due process complaint). The Hearing Officer's decision to close the record did not harm Ms. Jones, because he denied her request for residential placement

without prejudice and indicated that she could request an expedited hearing if she was dissatisfied with the IEP team's ultimate recommendation. *See* AR 29.

The Hearing Officer did not commit legal error in failing to keep the proceedings open in the manner that the D.C. Circuit appears to have anticipated in *B.D. v. District of Columbia*, 817 F.3d 792 (D.C. Cir. 2016). In *B.D.*, the D.C. Circuit reversed the denial of compensatory education and remanded to the district court for further proceedings, noting that if "further assessments are needed. . . . [T]he district court or Hearing Officer should not hesitate to order them, including, if appropriate on the updated record, assessment at a residential treatment facility." 817 F.3d at 800. *B.D.* does not address whether the record would remain open during the updated assessment, but appears to contemplate that the additional evidence would be gathered as part of the remand proceedings, which implicitly suggests that those proceedings would remain pending. *See id.* at 799–800. However, *B.D.* was in a different procedural posture than the administrative proceedings at issue here, and the remand proceedings anticipated in that case would not be subject to the forty-five day deadline codified at 34 C.F.R. 300.515(a). *B.D.* also involved the review of a Hearing Officer's award of compensatory education upon a finding of a denial of FAPE, 817 F.3d at 794; here, in contrast, the Hearing Officer found no denial of a FAPE and thus had no occasion to attempt to fashion a remedy for such a violation. Therefore, *B.D.* is distinguishable from this case.

For the reasons discussed above, the undersigned recommends that the trial judge find that the Hearing Officer did not err in deeming the record insufficient to evaluate the request for residential placement, ordering an IEP and further IEP team meeting to address that deficiency, and closing the record.

## VI. Whether the Hearing Officer Should Have Awarded Compensatory Education Services

Ms. Jones requests that if the Court finds that DCPS denied D.M. a FAPE, the Court award compensatory education services and order the Defendant "to fund a detailed analysis by Dr. Booker as to an appropriate compensatory education plan for the Student." Pl.'s Mem. at 17–18. The Hearing Officer did not award compensatory education because he concluded that DCPS did not deny D.M. a FAPE. *See* AR 29. As discussed above, the undersigned recommended that the trial judge find that the District's failure to identify or describe the Student's LRE for each hour in a school day in the July 2015 IEP constituted a denial of FAPE. *See supra* Part I.B.2. Accordingly, the Court must determine how to remedy that denial.

If a court finds that the school district has denied the Student a FAPE, the court has "'broad discretion to fashion an appropriate remedy,' which can go beyond prospectively providing a FAPE, and can include compensatory education." *B.D.*, 817 F.3d at 797–98 (quoting *Boose v. District of Columbia*, 786 F.3d 1054, 1056 (D.C. Cir. 2015)) (internal quotation marks omitted). "Under the theory of 'compensatory education,' courts and hearing officers may award 'educational services . . . to be provided prospectively to compensate for a past deficient program.'" *Reid*, 401 F.3d at 522 (citing *G. ex rel. RG v. Fort Bragg Dependent Schs.*, 343 F.3d 295, 308 (4th Cir. 2003)). "[A]n award of compensatory education 'must be reasonably calculated to provide the educational benefits that likely would have accrued from special education services the school district should have supplied in the first place.'" *B.D.*, 817 F.3d at 798 (quoting *Reid*, 401 F.3d at 524). Accordingly, such an award "must rely on individualized assessments, and the equitable and flexible nature of the remedy will produce different results in different cases depending on the child's needs." *Id.* (quoting *Reid*, 401 F.3d at 524) (internal quotation marks omitted).

This case presents an unusual situation because the denial of a FAPE did not affect the educational services that D.M. received in the relevant time period. Although the July 2015 IEP did not expressly require DCPS to educate D.M. wholly outside of general education, the Hearing Officer determined that DCPS nonetheless did so. *See* AR 15. The denial of a FAPE arises from the infringement of Ms. Jones's ability to participate in the process of determining the setting in which D.M. would be educated. Accordingly, there is no lost educational benefit to redress through compensatory education.

The Court's discretion to determine an appropriate remedy permits the award of other forms of relief to redress the harm to Ms. Jones. *See generally Florence Cty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 16 (1993) (noting courts' "broad discretion" to fashion relief and that "equitable considerations are relevant in fashioning relief" (quoting *Sch. Comm. of Burlington, Mass. v. Dep't of Educ. of Mass.*, 471 U.S. 359, 369 & 374 (1985) (internal quotation marks omitted)). Requiring DCPS to convene a meeting to discuss the setting for D.M.'s education, and to include Ms. Jones in that discussion, would redress her prior exclusion from that process. However, DCPS has already done so, by involving Ms. Jones in the discussion of D.M.'s educational placement in connection with the May 2016 IEP. *See supra* Part II (discussing Ms. Jones's involvement in IEP team meetings and development of May 2016 IEP). Ms. Jones does not claim to have incurred any additional costs, such as expert fees or additional attorney's fees, as a result of the lack of sufficient detail in the July 2015 IEP. Therefore, the undersigned cannot recommend that DCPS be required to reimburse such costs. In sum, the undersigned concludes that the harm Ms. Jones suffered has been mitigated by intervening events, and recommends that the trial judge award no equitable relief for this denial of a FAPE.

## VII. Whether the Hearing Officer Erred by Declining to Enter a Directed Verdict Favoring Plaintiff as a Sanction for Defendant's Failure to Comply with the Prehearing Order.

Ms. Jones also argues that the Hearing Officer erred when he failed to enter a verdict in her favor or otherwise sanction the District for failing to fully comply with the Prehearing Order. *See* Pl.'s Mem. at 18–19. The March 14, 2017 Prehearing Order required DCPS to file an amended answer that addressed all issues raised in the due process complaint. AR 647–48. The District filed an amended answer, but failed to address some of Ms. Jones's claims. AR 656–62. At the due process hearing, Ms. Jones asserted that DCPS's amended answer did not comply with the Prehearing Order and orally moved for a directed verdict and for sanctions. AR 784:19–785:21 (motion for directed verdict); AR 788:18–789:8 (request for sanctions). The Hearing Officer declined to direct judgment in favor of Ms. Jones or to award sanctions, reasoning that Ms. Jones should have raised these issues before the due process hearing. AR 786:18–787:8, 790:2–14; *see also* AR 2 ("I denied the motion as untimely filed and not in compliance with the Office of Dispute Resolution's *Standard Operating Procedures*.").

Ms. Jones cites no legal standard or authority supporting her claim, and simply asserts that the Hearing Officer erred and that she was prejudiced by the District's failure to appropriately respond. *See* Pl.'s Mem. at 19. In contrast, the District characterizes the Hearing Officer's ruling as a decision to resolve the parties' disputes on the merits, as opposed to on procedural grounds, and asks the Court to uphold that decision. Def.'s Opp'n at 20. The undersigned finds no reason to disturb the Hearing Officer's determination.

Although Ms. Jones framed her motion as a request for a directed verdict, her arguments are more analogous to a motion for default judgment. Ms. Jones asked the Hearing Officer to resolve claims in her favor because she and her counsel had "no idea what [the District's]

position is" due to the District's alleged failure to fully respond to her due process complaint. Similarly situated plaintiffs have sought default judgment at the administrative level. *See generally Suggs v. District of Columbia*, 679 F. Supp. 2d 43, 54 (D.D.C. 2010) (discussing plaintiff's challenge to hearing officer's refusal to enter default judgment where District failed to file an answer to administrative complaint); *Jalloh ex rel. R.H. v. District of Columbia*, 535 F. Supp. 2d 13, 19–20 (D.D.C. 2008) (affirming hearing officer's denial of motion for default judgment where District failed to respond to two arguments raised in due process complaint and included insufficient detail in response to other arguments); *Sykes v. District of Columbia*, 518 F. Supp. 2d 261, 266–67 (D.D.C. 2007) (affirming hearing officer's denial of default judgment where District's response to complaint lacked information required by the IDEA). A motion for directed verdict, in contrast, has an evidentiary foundation, and is granted "if, under the governing law, there can be but one reasonable conclusion as to the verdict." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Thus Ms. Jones's request does not align with the directed verdict standard.

Ms. Jones has not demonstrated that the Hearing Officer erred in deeming this motion, and her alternative request for sanctions, untimely. The District responded to the Prehearing Order on March 16, 2017. The due process hearing commenced on April 13, 2017, one day after its scheduled date. Ms. Jones could have sought further relief from the Hearing Officer at any time during those intervening weeks, and the Hearing Officer reasonably faulted her for failing to do so. *See* AR 786–87.

If the Hearing Officer had reached the merits of Ms. Jones's motion, the Court would have no basis to reverse his denial of the relief Ms. Jones requested. An insufficient response to a due process complaint is a procedural failure, and like other procedural violations of the IDEA

only warrants relief if it "affected the student's substantive rights." *Jalloh*, 535 F. Supp. 2d at 20 (quoting *Lesesne*, 447 F.3d at 834); *see also* 20 U.S.C. § 1415(f)(3)(E)(ii); *Sykes*, 518 F. Supp. 2d at 266–67. Ms. Jones has failed to show that the District's insufficient response[11] affected the Student's substantive rights. Ms. Jones claims to have been "prejudiced by not knowing Defendant's position on the issues stemming from the Student's placement at Kramer Middle School," but fails to indicate how that prejudiced her beyond speculating that she would have prepared differently for the hearing. Pl.'s Mem. at 19. If that lack of information were truly prejudicial, Ms. Jones presumably would have promptly brought it to the Hearing Officer's attention and sought an order directing DCPS to supplement its filing. Her decision to wait nearly a month to raise this issue undermines her claims of prejudice. *Cf. Suggs*, 679 F. Supp. 2d at 54 ("The extraordinary remedy of a default judgment is certainly not warranted where a party has failed to pursue less drastic solutions."). Moreover, Ms. Jones had the opportunity to present evidence and testimony regarding her claims at the hearing, despite any deficiencies in the District's answer and amended answer. Entering default judgment in these circumstances "would have subverted the administrative process" and provided relief "without a full examination of the record or [the Student's] needs." *Sykes*, 518 F. Supp. 2d at 267.

For the foregoing reasons, the undersigned finds no reason to disturb the Hearing Officer's decision to deny Ms. Jones's request for a directed verdict or other sanctions, and recommends that the trial judge resolve this issue in favor of the District.

---

[11] A review of DCPS's amended response, dated March 16, 2017, indicates that DCPS roughly addressed the three issues identified as deficient by the Hearing Officer in the Prehearing Order, but may not have fully responded to each of the four points, (i)–(iv), identified in the order. *See* AR 656–62. DCPS contends that the response was not deficient because it had addressed the issue in another matter, *Jones I*. *See* Def.'s Opp'n at 20. However, the Prehearing Order directed DCPS to address those issues in this case. Accordingly, the undersigned accepts Ms. Jones's allegation that DCPS's response did not fully comply with the Prehearing Order.

## RECOMMENDATION

For the reasons set forth in detail above, the undersigned recommends that the Court grant-in-part and deny-in-part Plaintiff's Motion for Summary Judgment, and grant-in-part and deny-in-part Defendant's Cross-Motion for Summary Judgment. Specifically, the undersigned recommends that the trial judge: (1) determine that DCPS denied the Student a FAPE by failing to describe the LRE or to account for all hours of education provided during the school week in the July 2015 IEP; (2) reject Plaintiff's challenge to the Hearing Officer's finding that the Student's May 2016 IEP was sufficient and did not deny the Student a FAPE; (3) reject Plaintiff's challenge to the Hearing Officer's finding that, while deficient, the May 2016 PWN did not deny the Student a FAPE; (4) reject Plaintiff's challenge to the Hearing Officer's determination that more information was necessary to address the question of whether the Student required a residential school placement, ordering such evaluation, then closing the record; (5) deny Plaintiff's request for compensatory education as the harm Ms. Jones suffered has been mitigated by intervening events; and (6) reject Plaintiff's challenge to the Hearing Officer's denial of her request for a directed verdict or other sanctions during the due process hearing.

## REVIEW BY THE DISTRICT COURT

The parties are hereby advised that under the provisions of Local Rule 72.3(b) of the United States District Court for the District of Columbia, any party who objects to this Report and Recommendation must file a written objection thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the report and/or recommendation to which objection is made, and the basis for such objections. The parties are further advised that failure to file timely

objections to the findings and recommendations set forth in this report may waive their right of appeal from an order of the District Court that adopts such findings and recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985).

Dated: September 5, 2018

ROBIN M. MERIWEATHER
UNITED STATES MAGISTRATE JUDGE